Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.

ATTORNEY FOR APPELLANTS:

**MICHAEL B. TROEMEL**
Lafayette, Indiana

ATTORNEYS FOR APPELLEE:

**ROBERT J. HENKE**
DCS, Central Administration
Indianapolis, Indiana

**CRAIG JONES**
DCS, Tippecanoe County Office
Lafayette, Indiana

**FILED**

Jan 18 2012, 9:27 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE

# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN THE MATTER OF THE TERMINATION OF PARENT-CHILD RELATIONSHIP OF AY.L. & AL.L., Minor Children, and R.L., Mother, and K.L., Father, Appellants, | ) ) ) ) ) ) ) ) |
| vs. | ) ) No. 79A02-1104-JT-448 ) |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, Appellee. | ) ) ) ) |

APPEAL FROM THE TIPPECANOE SUPERIOR COURT
The Honorable Loretta Rush, Judge
The Honorable Faith Graham, Magistrate
Cause Nos. 79D03-1011-JT-156, 79D03-1011-JT-157,
79D03-1011-JT-158, and 79D03-1011-JT-159

**January 18, 2012**

**MATHIAS, Judge**

K.L. ("Father") and R.L. ("Mother") appeal the involuntary termination of their respective parental rights to their children and argue that there is insufficient evidence supporting the trial court's judgment. We affirm.

**Facts and Procedural History**

Father and Mother are the biological parents of twins Ay.L. and Al.L., born in September 2009. Father and Mother were married the day after the twins were born. In November 2009, the Tippecanoe County Office of the Indiana Department of Child Services ("TCDCS") received a report that local law enforcement had responded to a domestic disturbance call at the family home which resulted in Father being arrested for domestic battery in the presence of a child. The following month, TCDCS received a second report that Mother had taken Al.L. to the hospital for vomiting but medical personnel also discovered the child was suffering from a healing rib fracture.

At the hospital, Mother was unable to provide an immediate explanation as to how Al.L's rib had been injured. Additionally, TCDCS learned during its investigation of the matter that Mother was not administering the prematurely-born twins' daily medications as prescribed by doctors, but was instead "altering" the prescribed doses and giving "prophylactic" doses of Ay.L's Amoxicillin to Al.L. because Al.L. "seemed ill." DCS

2

Exhibit 3, Intake Officer's Report p. 2.[1]  Mother also admitted that she had extensive mental health issues and needed help with her parenting skills.  As for Father, TCDCS learned that he had an extensive criminal history which included battery and alcohol-related offenses.  Father also admitted to caseworkers that he needed substance abuse treatment, and both parents acknowledged they had been molested and neglected as children by family members.

As a result of its investigation, TCDCS took the twins into protective custody and filed petitions alleging the children were in need of services ("CHINS").   Both parents later admitted to the allegations of the CHINS petitions, and the children were so adjudicated.  Following a hearing in February 2010, the trial court issued an order formally removing the twins from Mother's and Father's care and making the twins wards of TCDCS.  The court's dispositional order further directed both parents to participate in and successfully complete a variety of tasks and services designed to improve their respective parenting abilities and facilitate reunification of the family. Specifically, Father and Mother were ordered to, among other things: (1) participate in substance abuse evaluations and treatment; (2) submit to random drug screens; (3) undergo psychological assessments; (4) participate in individual counseling; (5) complete parenting and bonding assessments, as well as parenting classes; and (6) engage in home-based case management services.   Additionally, Mother was offered medical

---

[1] The pages of the Appellants' two, separately-bound volumes of Exhibits submitted on appeal are not sequentially enumerated.  The first volume of Exhibits also does not contain an index as is contemplated by Ind. Appellate R. 29(a).  We therefore are constrained to cite to the document itself.

management services, including alternative pain management services, community support programs, an Area IV repaid re-housing program, and vocational rehabilitation. Father was also offered a non-violent alternatives program.

During the CHINS proceedings, neither parent demonstrated a real commitment to completing court-ordered services and achieving reunification. Although Mother had been diagnosed with major depression, borderline personality disorder, and post-traumatic stress disorder ("PTSD"), she refused to regularly attend individual counseling sessions or to take her medications as prescribed. She also engaged in self-harm by cutting herself on several occasions requiring stitches, tested positive for illegal substances, and was admitted to in-patient psychiatric treatment at Wabash Valley Alliance on five separate occasions.

Father was also unsuccessful in court-ordered reunification services. He entered "rehab" but "checked [himself] out" before completing the program. Tr. p. 65. Father also tested positive for marijuana and was found in contempt of court in May 2010 for failing to remain drug and alcohol-free. Additionally, Father did not obtain employment, failed to appear for his scheduled intake assessment for anger management services, and was incarcerated for a majority of the CHINS proceedings on new domestic battery charges. In September 2010, Father was arrested on felony sexual molestation charges for an incident involving Mother's nephew.

TCDCS filed petitions seeking the involuntary termination of Father's and Mother's parental rights to the twins in November 2010. A consolidated, two-day

4

evidentiary hearing on the termination petitions commenced later in February 2011 and concluded in March 2011. Both hearings were held without objection. During the termination hearings, TCDCS presented substantial evidence concerning both Father's and Mother's individual histories of substance abuse and criminal activities. The evidence also established that Father remained incarcerated on Class A felony sexual molestation charges and that neither parent had successfully completed a majority of the trial court's dispositional goals, including parenting classes, substance abuse treatment, and refraining from criminal activity. Although the evidence established that Mother had recently made some improvements in treating her mental health issues, the evidence further established that Mother had experienced similar episodes of medicinal compliance and improved daily living, only to be followed by recurrent lapses and self-destructive behaviors. Finally, TCDCS presented evidence showing that the twins were living together and thriving in a relative pre-adoptive foster home.

At the conclusion of the termination hearing, the trial court took the matter under advisement. In April 2011, the court entered one order terminating both Father's and Mother's parental rights to the twins.[2] Father and Mother now appeal.

## Discussion and Decision

---

[2] The TCDCS filed four termination petitions, and the order terminating Mother's and Father's parental rights listed all four cause numbers. Indiana Appellate Rule 38(A) provides that "[w]hen two (2) or more actions have been consolidated for trial or hearing in the trial court . . . , they shall remain consolidated on appeal." Because the trial court held a consolidated evidentiary hearing on all four termination petitions, the four cases remain consolidated on appeal to our court.

5

When reviewing a judgment terminating parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. In re D.D., 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), trans. denied. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. Id. Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. In re L.S., 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), trans. denied.

The trial court entered specific findings of fact and conclusions, and therefore, we apply a two-tiered standard of review. Bester v. Lake Cnty. Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. Id. "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." Quillen v. Quillen, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. L.S., 717 N.E.2d at 208.

"The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." In re M.B., 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), trans. denied. However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. In re K.S., 750 N.E.2d 832, 837 (Ind. Ct. App. 2001). Termination of a parent-child relationship is proper where a child's emotional and

6

physical development is threatened.  Id.  Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities.  Id. at 836.

Before an involuntary termination of parental rights may occur in Indiana, the State is required to allege and prove, among other things:

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) termination is in the best interests of the child[.]

Ind. Code § 31-35-2-4(b)(2)(B) & (C).  "The State's burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'"  In re G.Y., 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2).  If the trial court finds that the allegations in a petition described in section 4 of this chapter are true, the court shall terminate the parent-child relationship.  Ind. Code § 31-35-2-8(a).  Father and Mother challenge the sufficiency of the evidence supporting the trial court's findings as to subsections (b)(2)(B) and (C) of the termination statute cited above.

7

## I. Sufficiency of the Evidence - Conditions Remedied

In challenging the sufficiency of the evidence supporting the trial court's determination that there is a reasonable probability the conditions resulting in the twins' removal will not be remedied, Father asserts the trial court's Findings Nos. 4 and 11 are unsupported by the evidence. Mother, on the other hand, does not specifically challenge any particular finding of fact as unsupported by the evidence. Rather, Mother claims that the trial court's findings, in general, fail to "take into account the significant progress [Mother] had made since she was discharged from [TCDCS's] services or the positive opinions of many of [Mother's] previous and current caseworkers." Mother's Appellant's Br. at 16. Both parents therefore contend they are entitled to reversal.

We begin our review by observing that Indiana's termination statute requires the trial court to find only one of the three requirements of Indiana Code section 31-35-2-4(b)(2)(B) to be established by clear and convincing evidence before it can properly terminate parental rights. See id. Because we find it to be dispositive under the facts of this case, we only consider whether TCDCS established, by clear and convincing evidence, that there is a reasonable probability the conditions resulting in the twins' removal or continued placement outside Father's and Mother's care will not be remedied. See I.C. § 31-35-2-4(b)(2)(B)(i).

In making such a determination, the trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. In re J.T., 742 N.E.2d 509, 512 (Ind. Ct. App. 2001),

8

<u>trans. denied</u>. The court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." <u>Id.</u> Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. <u>A.F. v. Marion Cnty. Office of Family & Children</u>, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), <u>trans. denied</u>. The trial court may also consider any services offered to the parent by the local Indiana Department of Child Services office (here, TCDCS) and the parent's response to those services, as evidence of whether conditions will be remedied. <u>Id.</u> Moreover, TCDCS is not required to provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. <u>In re Kay L.</u>, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

Here, the trial court made detailed findings in its judgment regarding Father's and Mother's unresolved parenting, substance abuse, and psychological issues. In so doing, the trial court acknowledged the instability and lack of safety in the family home due to episodes of domestic violence by Father against Mother and her sister in the children's presence, admitted substance abuse by both parents, as well as the unexplained injuries to Al.L. and the improper dispensation of medication to the children at the beginning of this case. Although the court acknowledged Mother's "recent improved attendance and progress in therapy [which] appears to coincide with new medication for ADHD," as well as the fact that "[o]ver the course of the CHINS proceeding, Mother improved in some

9

parenting skills and became more confident during visits," the court further noted that Mother was never able to progress to semi-supervised visits "due to safety concerns" such as "[m]edications, nicorette gum, a pen[,] and cigarette butts" being left within the twins' reach. Father's Appellant's App. p. 30. The court also specifically found that Mother's "medication compliance has historically been problematic," that she has a "history of misusing her prescribed medications," and that she was observed to be "under the influence of drugs or alcohol during visitation and case management" meetings. Id. at 29-30. In addition, the trial court noted Mother had cancelled her last scheduled visit with the children, "stating she wished to have the children placed for adoption." Id. at 30.

The trial court also detailed both parents' extensive histories of criminal activity, including Mother's past arrests and convictions for prostitution, felony theft, check deception, false informing, operating a vehicle while suspended, and criminal conversion, along with several petitions to revoke her probation prior to the twins' birth. As for Father, the trial court found he had a "long-standing history of instability, substance abuse, and criminal behavior." Id. The court further found Father had been "in and out of incarceration during most of the children's lives and during most of the CHINS proceeding," and likewise detailed Father's extensive criminal history, including his convictions for battery on law enforcement in 2006 and 2008, criminal conversion in 2007, felony theft in March and October 2008, trespass in 2008, and felony domestic battery and public intoxication in 2010. Id. In addition, the court specifically found Father "has a drinking problem," was "physically abusive to Mother," has "historically

10

been unemployed," and was incarcerated on Class A felony child molesting charges at the time of the termination hearing. Id.

Based on these and other findings, the trial court concluded as follows:

1. There is a reasonable probability that the conditions that resulted in the removal of the children from the parents' care or the reasons for continued placement outside the home will not be remedied. Neither parent has yet to demonstrate the ability or willingness to make lasting changes from past behaviors. There is no reasonable probability that either parent will be able to maintain stability in order to care and provide adequately for these children. Further efforts to reunify would have continued negative effects on the children.

Id. at 30-31. A thorough review of the record leaves us satisfied that clear and convincing evidence supports the trial court's findings and conclusions, which in turn support the court's ultimate decision to terminate both Father's and Mother's parental rights to both children.

Uncontroverted evidence establishes that, at the time of the termination hearing, Father had failed to successfully complete a majority of the court-ordered reunification services. Most notably, Father had failed to complete substance abuse treatment, parenting classes, and anger management services. Additionally, Father had a lengthy history of criminal activity, including convictions for domestic battery and public intoxication and remained unavailable to parent the twins due, in large part, to his ongoing incarceration on pending Class A felony child molestation charges. Moreover, Father's assertion that the trial court's Findings Nos. 4 and 11 are unsupported by the evidence is also unavailing.

Finding No. 4 provides, in part, that evaluations of the parents revealed "no barriers to the parents' ability to participate in services and achieve reunification so long as the parents were treatment and medication compliant." Id. at 28. Father complains that this specific finding is unsupported by the evidence because he has been "continuously incarcerated since September 23, 2010, and has not had the opportunity to participate in the services and thus has not had an opportunity to show his parenting skills." Father's Appellant's Br. at 7 (internal citation omitted). The record makes clear, however, that the children were removed in November 2009 and that Father was able to, and in fact did, participate in reunification services, albeit unsuccessfully, prior to his September 2010 incarceration. Furthermore, Father's incarceration was the result of his voluntary decision to participate in illegal activities and thus does not constitute a "barrier" as contemplated by the trial court's finding cited above. We have previously explained that a parent who engages in criminal activities runs the risk of being denied the opportunity to having a meaningful relationship with his or her child. Castro v. State Office of Family & Children, 842 N.E.2d 367, 374 (Ind. Ct. App. 2006), trans. denied.

Father's complaint regarding Finding No. 11 is likewise unpersuasive. Father admits on appeal that he tested positive for alcohol and marijuana during the underlying CHINS proceedings. Nevertheless, Father asserts that the trial court erroneously determined that he has a "substance abuse issue" in Finding No. 11 because he "has not failed a drug screen" since May 2010. Father's Appellant's Br. at 7. This argument is unsupported by the record. In addition to testing positive for alcohol and marijuana

12

during the underlying CHINS proceedings, Father admitted during the termination hearing that "dealing with alcohol" had been "a struggle" for Father "a lot in [his] life." Tr. p. 72. Moreover, Mother testified that Father has a "profound alcohol problem," and Father's extensive criminal history includes an alcohol-related domestic violence conviction, as well as a 2010 conviction for public intoxication. Id. at 107. We therefore conclude that ample evidence supports the trial court's Finding No. 11.

Turning to Mother's allegation of error, we observe that she, too, had made little, if any, progress in demonstrating that she will ever be capable of providing the twins with a safe and stable home environment. The evidence establishes that, at the time of the termination hearing, Mother was unemployed, had failed to successfully complete parenting classes and substance abuse treatment, and had not visited with the children since September 2010. Mother had also failed to secure stable, independent housing, and was living with her own mother notwithstanding at least three unsuccessful attempts to do so in the past.

As for Mother's mental health issues, Mother's psychiatrist, Dr. Lori Rogers, and several service providers confirmed that Mother had recently appeared more "calm," her mood had stabilized, and she was better able to "focus," due in large part to a change in her medication. Id. at 153, 167. Mother had also re-engaged in monthly counseling sessions, was participating in parenting classes, and was taking her medication as prescribed. Notwithstanding Mother's recent improvements, Dr. Rogers cautioned that Mother's mental health issues would never be truly cured and, consequently, her

13

symptoms would likely return if she ever stopped taking her medication. Similarly, TCDCS case manager Harry Heyer described Mother's mental health issues as "chronic illness[es]" that are "not going away." Id. at 189.

Significantly, there was also extensive testimony from multiple service providers confirming that Mother's lengthy history of initial compliance with medications, followed by decompensation, and that she had experienced similar periods of stability in the past, followed by relapse and periods of crisis and self-harm. For example, Mother's therapist, Rebecca Sprague, informed the trial court that she had worked with Mother for over three years and that Mother's participation in weekly therapy had "always sort of been hit or miss." Id. at 15. Sprague further explained that Mother primarily attended counseling appointments only during times of crisis, and then would disengage until the next crisis. When asked if someone with Mother's diagnoses can make "real progress" in their behavior when utilizing this sort of "triage approach" to their mental health care, Sprague answered, "[N]ot enough to make a real difference[.]" Id. at 20. Case manager Heyer likewise informed the court that there were times during the underlying proceedings when Mother would "struggle" by "either taking her meds inappropriately [or] . . . for recreational purposes," as well as "other periods where she did very well with her medication management" and "really stuck to the regiment for extended periods of time." Id. at 179.

Mother's own testimony lends further support to the trial court's findings. During the termination hearing, Mother admitted that she drank alcohol, smoked marijuana, and

did not take her medication as prescribed during the underling CHINS proceedings. Mother also confirmed that she was "kicked out" of two intensive out-patient substance abuse programs in 2010, failed to complete court-ordered parenting class, voluntarily withdrew from visitation services with the twins in October 2010, and was currently unemployed and living with her mother. Id. at 111. Regarding her mental health struggles, Mother indicated she had experienced "numerous" in-patient psychiatric hospitalizations dating back to childhood and including approximately five in-patient stays during the past twelve months. Mother also acknowledged her cyclical history of relapse and self-harm, including a recent cutting incident in October 2010 that required seventeen stitches, and further confided that these "relapses happen when [she's] stressed out." Id. at 114.

As noted earlier, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. D.D., 804 N.E.2d at 266. Moreover, where a parent's "pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve." In re A.H., 832 N.E.2d 563, 570 (Ind. Ct. App. 2005). After reviewing the record, we conclude that TCDCS presented clear and convincing evidence to support the trial court's findings and ultimate determination that there is a reasonable probability the conditions leading to the twins' removal or continued placement outside of Father's and Mother's care will not be remedied.

15

The juvenile court was responsible for judging Father's and Mother's credibility and for weighing their testimony of changed conditions against TCDCS's evidence demonstrating both parents remained incapable of providing Ay.L. and Al.L. with a safe, stable, and nurturing home environment. It is clear from the language of the judgment that the trial court considered the evidence of the former, but gave more weight to the evidence of the latter, which it was entitled to do. See Bergman v. Knox Cnty Office of Family & Children, 750 N.E.2d 809, 812 (Ind. Ct. App. 2001) (concluding that trial court was permitted to and in fact gave more weight to abundant evidence of mother's pattern of conduct in neglecting her children during several years prior to termination hearing than to mother's testimony that she had changed her life to better accommodate children's needs). Father's and Mother's respective arguments on appeal amount to an invitation to reweigh the evidence, and this we may not do. D.D., 804 N.E.2d at 265; see also In re L.V.N., 799 N.E.2d 63, 68-71 (Ind. Ct. App. 2003) (concluding that mother's argument that conditions had changed and that she was now drug-free constituted an impermissible invitation to reweigh the evidence).

## II. Best Interests

We next consider Father's and Mother's assertions that termination of their respective parent-child relationships with the twins is not in the children's best interests. We are ever mindful that, when determining what is in a child's best interests, a trial court is required to look beyond the factors identified by the Indiana Department of Child Services and to look to the totality of the evidence. McBride v. Monroe Cnty. Office of

16

Family & Children, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In so doing, however, the court must subordinate the interests of the parent to those of the child. Id. Moreover, we have previously explained that recommendations from the case manager and child advocate that parental rights should be terminated support a finding that termination is in the child's best interests. Id.

Here, in addition to the findings set forth previously, when it determined that termination of parental rights is in the twins' best interests, the trial court found that "[n]either parent has yet shown a real investment in reunification." Father's Appellant's App. p. 30. The court also noted court-appointed special advocate ("CASA") Susan Nelson's testimony supporting termination of parental rights, as well as her detailed explanation of the twins' significant medical needs that were being met by the current, pre-adoptive foster parents. As for the children, the court found that the twins had "thrived" in foster care, were "bonded" with their foster parents, and "need[ed] permanency now." Id. at 30. These findings and conclusions, too, are supported by the evidence.

Both case manager Heyer and CASA Nelson recommended termination of Father's and Mother's parental rights. In so doing, Nelson testified that "[s]ince the visitation ceased in the fall[,] the children have both experienced a great improvement in their behavior, . . . in any psychological or sensory issues that they've had[,] [a]nd they've just really thrived[.]" Tr. pp. 236-37. Nelson went on to say that the children needed "permanency" and a "stable environment, and that she was "concern[ed]" that

17

moving the twins out of their current placement would be "detrimental" and might cause the children to "actually backslide in their development." Id. at 237-38.

A trial court need not wait until a child is irreversibly harmed by a dangerous and damaging homelife such that his or her physical, mental, and social growth is permanently impaired before terminating the parent-child relationship. In re E.S., 762 N.E.2d 1287 (Ind. Ct. App. 2002). Father's incarceration, Mother's unresolved mental health issues and both parents' failure to complete and/or benefit from a majority of the trial court's dispositional orders, coupled with the testimony from Heyer and Nelson recommending termination of the parent-child relationships, lead us to the inescapable conclusion that the trial court's determination that termination of Father's and Mother's parental rights is in Ay.L's and Al.L.'s best interests is supported by the evidence. See, e.g., In re A.I., 825 N.E.2d 798, 811 (Ind. Ct. App. 2005) (concluding that testimony from child's court-appointed advocate and family case manager regarding child's need for permanency and recommendation to terminate parental rights, coupled with evidence that conditions causing removal will not be remedied, constitutes sufficient evidence to support termination of parental rights), trans. denied.

This Court will reverse a termination of parental rights "only upon a showing of 'clear error'– that which leaves us with a definite and firm conviction that a mistake has been made." In re A.N.J., 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting Egly v. Blackford Cnty. Dep't of Public Welfare, 592 N.E.2d 1232, 1235 (Ind. 1992)). We find no such error here.

Affirmed.

FRIEDLANDER, J., and RILEY, J., concur.